T.C. Memo. 1995-538


UNITED STATES TAX COURT


YARBROUGH OLDSMOBILE CADILLAC, INC., Petitioner
<u>v</u>. COMMISSIONER OF INTERNAL REVENUE, Respondent

ELVIN P. YARBROUGH, Petitioner
<u>v</u>. COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 7174-92, 7175-92.      Filed November 13, 1995.


<u>James D. O'Donnell</u> and <u>Libero Marinelli, Jr.</u>, for petitioners.

<u>Francis C. Mucciolo</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

SWIFT, <u>Judge</u>:  Respondent determined deficiencies in petitioners' Federal income taxes and additions to tax as follows:

Elvin P. Yarbrough

| | | Additions to Tax | | | | |
|---|---|---|---|---|---|---|
| Year | Deficiency | Sec. 6653 (b)(1) | Sec. 6653 (b)(2) | Sec. 6653 (b)(1)(A) | Sec. 6653 (b)(1)(B) | Sec. 6661 |
| 1983 | $165,498 | $104,567 | * | | | $41,374 |
| 1984 | 164,324 | 148,555 | * | | | 41,081 |
| 1985 | 150,708 | 75,354 | * | | | 30,177 |
| 1986 | 95,021 | | | $71,266 | * | 23,755 |

* 50 percent of interest due on portion of
underpayment attributable to fraud.

Yarbrough Oldsmobile Cadillac, Inc.

| | | Additions to Tax | | |
|---|---|---|---|---|
| Year | Deficiency | Sec. 6653(b)(1) | Sec. 6653(b)(2) | Sec. 6661 |
| 1983 | $33,649 | $16,825 | * | $8,412 |
| 1984 | 18,097 | 9,048 | * | 4,524 |
| 1985 | 34,118 | 17,059 | * | 8,529 |

* 50 percent of interest due on portion of
underpayment attributable to fraud.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

After settlement of some issues, the issues for decision in these consolidated cases are: (1) Whether petitioner Yarbrough Oldsmobile Cadillac, Inc. (YOC), is entitled to certain claimed business expense deductions disallowed by respondent; (2) whether petitioner Elvin P. Yarbrough (Elvin) is to be treated as having received constructive dividends from YOC, and, if so, the amount of the constructive dividends; (3) whether prizes and awards that

Elvin received are to be treated as income to Elvin; and (4) whether Elvin and YOC are liable for the fraud and other additions to tax, and if so which adjustments are attributable to fraud.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

At the time the petitions were filed, Elvin resided in and YOC maintained its principal place of business in St. Augustine, Florida.

In 1974, Elvin formed YOC, an Oldsmobile, Cadillac, and Nissan automobile dealership. From 1983 through 1986, Elvin owned 51 percent and Herbert H. Swisher (Swisher) owned 49 percent of YOC's outstanding stock. Elvin was president, Elvin's wife Kelley Yarbrough (Mrs. Yarbrough) was vice president, and Swisher was secretary-treasurer of YOC. Elvin and Swisher were apparently the only directors of YOC. In 1989, Swisher sold to Elvin all of his YOC stock, and Elvin thereafter owned 100 percent of the outstanding YOC stock. Swisher died on May 4, 1990.

During the relevant years, Elvin was in charge of day-to-day and overall operations of YOC. Swisher was merely a passive investor in YOC.

The YOC-Elvin Account

There was maintained on YOC's books and records an asset account entitled Accounts Receivable-Customers (Account 220). This account was used generally to record amounts due from YOC's customers. At Elvin's direction, a subaccount was established and maintained within Account 220 to record transfers of funds by YOC to, or for the benefit of, Elvin. This YOC subaccount is hereinafter referred to as the YOC-Elvin Account.

Transfers of funds by YOC to Elvin or for Elvin's benefit were made at Elvin's direction, and they were recorded as debits or increases to the balance of the YOC-Elvin Account.

Certain payments made by Elvin to YOC and certain salary and other adjustments were recorded as credits or decreases to the balance of the YOC-Elvin Account.

On December 31 of each of the years 1982 through 1986, there was reflected in the YOC-Elvin Account an outstanding debit balance as follows:

| Year | Debit Balance |
|------|---------------|
| 1982 | $ 87,465 |
| 1983 | 223,138 |
| 1984 | 240,648 |
| 1985 | 305,473 |
| 1986 | 564,412 |

The four schedules set forth below (one schedule for each year) reflect in detail the transfers of YOC's funds that

occurred during 1983, 1984, 1985, and 1986 that benefited Elvin personally and that were recorded in YOC's books as debits or increases to the YOC-Elvin Account. The schedules also reflect payments Elvin made to YOC on the YOC-Elvin Account and salary and other adjustments that were reflected as credits or decreases to the YOC-Elvin Account.

Each of the four schedules also indicates the identity of the third party payees or recipients of YOC's funds or property where YOC's funds or property were transferred to third-parties on behalf of Elvin. The last column of each schedule describes, where indicated in the record, the nature of the transfers that provided a personal benefit to Elvin and the nature of Elvin's payments and of the other adjustments that were reflected as credits or decreases to the balance of the YOC-Elvin Account.

### 1983 ENTRIES TO THE YOC-ELVIN ACCOUNT

| Date | Debit or Increase | Credit or Decrease | Recipient of Funds | Nature of Transfer |
|------|-------------------|--------------------|--------------------|--------------------|
| 01/05/83 | $45,000 | | Atlantic Bank | Purchase of real property for Mrs. Yarbrough's interior decorating business |
| 02/03/83 | 3,000 | | Elvin | Cash |
| 02/08/83 | 1,000 | | Elvin | Cash |
| 02/15/83 | | $48,627 | YOC | Proceeds from YOC bank loan |
| 02/16/83 | 5,000 | | Michael Walrath | --- |
| 03/22/83 | 6,000 | | Elvin | --- |
| 04/19/83 | 55,000 | | San Sebastian Marine | Purchase for Elvin of floating restaurant |
| 04/25/83 | 760 | | Yankee Clipper | Purchase of wire wheels for Elvin's Cadillac |
| 04/22/83 | 982 | | Aero Sport | --- |
| 04/29/83 | 1,400 | | Clock Realty, Inc. | Purchase of Elvin's condominium |

| Date | Debit or Increase | Credit or Decrease | Recipient of Funds | Nature of Transfer |
|------|------|------|------|------|
| 04/30/83 | | 55,000 | YOC | Transfer ownership of floating restaurant into YOC's used car inventory |

[Continued from prior page]


### 1983 ENTRIES TO THE YOC-ELVIN ACCOUNT (CONTINUED)

| Date | Debit or Increase | Credit or Decrease | Recipient of Funds | Nature of Transfer |
|------|------|------|------|------|
| 05/20/83 | | $ 3 | YOC | --- |
| 05/30/83 | | 1,400 | YOC | Payment by Elvin |
| 06/09/83 | $ 87,500 | | Title & Abstract company | Purchase of Elvin's Coastal Highway real property |
| 06/27/83 | 2,060 | | Hardwick Fences | Installation of fence at Elvin's residence |
| 07/08/83 | | 25,000 | YOC | Payment by Elvin |
| 07/26/83 | 23,500 | | Construction company | Purchase of real property |
| 07/27/83 | | 23,500 | YOC | Payment by Elvin |
| 12/06/83 | 50,000 | | Elvin | Purchase of Elvin's liquor license |
| Total | $281,202 | $153,530 | | |

## 1984 ENTRIES TO THE YOC-ELVIN ACCOUNT

| Date | Debit or Increase | Credit or Decrease | Recipient of Funds | Nature of Transfer |
|---|---|---|---|---|
| 02/29/84 | | $ 760 | YOC | Payment by Elvin |
| 03/02/84 | | 49,959 | YOC | YOC bonus to Elvin |
| 03/02/84 | | 49,959 | YOC | YOC bonus to Elvin |
| 03/14/84 | $ 99,918 | | Elvin | Reduction in other debt Elvin owed YOC |
| 03/30/84 | 2,000 | | Elvin | --- |
| 04/12/84 | 15,000 | | Elvin | --- |
| 05/10/84 | | 6,900 | YOC | Credit of Elvin's payroll check |
| 05/21/84 | 5,170 | | Fitzgerald Excavating | Payment to tear down a structure on Elvin's Coastal Highway property |
| 08/23/84 | 3,000 | | Elvin | --- |
| 09/04/84 | 10,000 | | Elvin | --- |
| 09/10/84 | | 5,000 | YOC | Credit of Elvin's payroll check |
| 10/10/84 | | 5,000 | YOC | Credit of Elvin's payroll check |
| Total | $135,088 | $117,578 | | |

## 1985 ENTRIES TO THE YOC-ElVIN ACCOUNT

| Date | Debit or Increase | Credit or Decrease | Recipient of Funds | Nature of Transfer |
|------|-------------------|--------------------|--------------------|--------------------|
| 01/17/85 | $ 7,500 | | Elvin | --- |
| 01/23/85 | 25,000 | | North River Development Corp. | Transfer of funds to Elvin's 50-percent owned corporation |
| 01/23/85 | | $25,000 | YOC | Transfer of funds from North River Development Corp. to YOC |
| 02/06/85 | | 1,500 | YOC | Credit of Elvin's payroll check |
| 02/08/85 | 1,500 | | Elvin | Cash |
| 02/08/85 | 1,200 | | John Simmons | Rental of condominium |
| 02/11/85 | 3,195 | | Florida Power & Light | Payment of Elvin's utility bill |
| 03/09/85 | 6,650 | | John Simmons | Rental of condominium |
| 07/03/85 | 15,000 | | Elvin | Cash |
| 10/02/85 | 7,325 | | Statewide Paving | Payment of paving work |
| 10/09/85 | 4,196 | | Elvin | Cash |
| 10/14/85 | | 4,196 | YOC | Payment by Elvin |
| 12/02/85 | 35,000 | | Elvin | Cash |
| 12/18/85 | 25,000 | | Ned McQuaig | Purchase for Elvin of Chrysler-Plymouth dealership |
| 12/31/85 | | 25,000 | None | Transfer debit to Yarbrough Chrysler-Plymouth, Inc. |
| 12/31/85 | 26,478 | | None | Accrued interest for 1985 |

| Date | | | | |
|------|------|------|------|------|
| 12/31/85 | | 37,523 | YOC | Payment by Elvin -- includes interest accrued on 12/31/85 |
| Total | $158,044 | $93,219 | | |

## 1986 ENTRIES TO THE YOC-ELVIN ACCOUNT

| Date | Debit or Increase | Credit or Decrease | Recipient of Funds | Nature of Transfer |
|------|-------------------|--------------------|--------------------|--------------------|
| 01/02/86 | $ 296 | | Florida Power & Light | Payment of Elvin's utility bill |
| 01/16/86 | 5,000 | | Elvin | Cash |
| 02/21/86 | 10,500 | | Elvin | Cash |
| 04/21/86 | 25,000 | | None | To transfer debit from Yarbrough Chrysler-Plymouth, Inc. to the YOC-Elvin Account |
| 10/28/86 | 2,000 | | None | To transfer debit from customer to the YOC-Elvin Account |
| 11/06/86 | | $ 50,000 | YOC | Payment by Elvin from funds received on sale of State liquor license that Elvin had purchased on 12/6/83 |
| 11/17/86 | | 122,000 | YOC | Payment by Elvin |
| 11/17/86 | 325,939 | | Upchurch, Bailey & Upchurch, P.A., Trust Account | Purchase of real property |
| 12/26/86 | 62,500 | | None | To reflect that correct amount of payment received on 11/17/86 was only $59,500 |
| 12/26/86 | 31,141 | | None | Accrued interest for 1986 |

| | | | |
|---|---|---|---|
| 12/31/86 | | 31,437 | YOC | Elvin's payment of $31,437 for interest accrued in 1986 and to reimburse YOC for payment of Elvin's $296 utility bill paid on 1/2/86 |
| Total | $462,376 | $203,437 | | |

During the years in issue, Elvin's purported liability to YOC on the debit balance of the YOC-Elvin Account was never reflected by any promissory notes to YOC or by any other loan documents.  Elvin never provided YOC any collateral or security for, nor was he required to make periodic payments to YOC on, the debit balance of the YOC-Elvin Account.

During 1983 through 1986, Elvin did not list his purported liability on the debit balance of the YOC-Elvin Account as a liability on his financial statements that he prepared and submitted to banks in connection with personal loan applications.

On occasion from 1977 through 1984, YOC's controllers advised Elvin that consistent with Elvin's purported liability on the YOC-Elvin Account, loan documents should be executed, interest payments should be made, and the outstanding debit balance in the account should be reduced.  YOC's controllers also advised Elvin that YOC should not pay Elvin's personal expenses.

With regard to interest, during 1983 through 1986, YOC's accounting system generally automatically charged interest on debit balances in Account 220 subaccounts that had outstanding debit balances for more than 30 days.  Interest, however, during 1983 and 1984 and in prior years, was not charged on the debit balance in the YOC-Elvin Account.  Not until December 31, 1985, after Elvin became aware that he was under criminal tax investigation, did Elvin direct YOC's controller to calculate interest on the debit balance of the YOC-Elvin Account for 1985

and subsequent years at a specified market rate and to debit the interest so calculated to the YOC-Elvin Account.

The November 17, 1986, $325,939 transaction referred to in the above schedule for 1986 warrants further explanation. On July 28, 1983, Elvin and Charles R. Koons (Koons) formed North River Development Corp. (NRDC) as a Florida corporation to open a new Chrysler-Plymouth dealership. Elvin and Koons each owned 50 percent of NRDC's outstanding stock.

On November 17, 1986, in order to provide funds for the purchase of real property that was located one block from the YOC dealership and that would serve as the site of the new Chrysler-Plymouth dealership, YOC transferred $325,939 to an escrow account to provide one-half of the funds necessary for purchase of the real property. As a result of this transfer, the outstanding debit balance in the YOC-Elvin Account was increased by $325,939.

No representative of NRDC, nor Elvin, executed any loan documents or promissory notes in connection with this use of $325,939 of YOC's funds to purchase the real property. The real property that was purchased was titled in the name of NRDC.

In 1987, YOC's outside accounting firm reclassified on YOC's books the $325,939 debit to the YOC-Elvin Account related to the above transaction as a debit to a new YOC account receivable reflecting a debt owed by NRDC to YOC. It is not clear in the record who requested the accounting firm to make this change.

As a result of the above transaction, Elvin, in 1986, as controlling shareholder of YOC, effectively withdrew $325,939 from YOC and, as a 50-percent shareholder of NRDC, made a capital contribution of that amount to NRDC to enable NRDC, along with Koons' matching contribution of approximately $325,939, to purchase the above-referred-to real property.

On audit, respondent determined that for each year in issue the yearend net increase over the prior year in the debit balance of the YOC-Elvin Account represented a constructive dividend to Elvin. The net increases for 1983, 1984, 1985, and 1986, treated by respondent as constructive dividends to Elvin (limited by YOC's annual earnings and profits), were $137,673, $17,510, $64,825, and $180,906, respectively.

The Yacht Capriole

On or about August 6, 1984, a used 60-foot motor yacht named the Capriole was purchased from David M. Ponce (Ponce) for $80,000 in cash. Elvin created a false invoice reflecting that Ponce traded in the Capriole to YOC in exchange for a 1983 Oldsmobile Firenza with a stated value of $5,500. Elvin, using YOC's funds, made a cash downpayment to Ponce of $5,000, and then applied to Barnett Bank of St. John's County (Barnett Bank) for an $80,000 loan, nominally on behalf of YOC, to provide the remaining funds for purchase of the yacht. With regard to the $80,000 loan application, on September 27, 1984, Elvin signed a

promissory note reflecting his capacity as YOC's president and as personal guarantor of the note.

On September 28, 1984, Barnett Bank approved the $80,000 loan application and issued a check for $79,880 to YOC representing the net loan proceeds. The loan proceeds were used to pay the remaining balance due to Ponce for purchase of the Capriole. The Capriole was used as collateral for the $80,000 loan.

Ponce understood that Elvin, not YOC, was purchasing the Capriole. Elvin located the Capriole, negotiated for its purchase, created false documentation to make it appear as if YOC received the Capriole in trade on the purchase of a new automobile, and used the loan proceeds to make the purchase.

On the Florida State sales tax receipt regarding purchase of the Capriole, the purchase price of the Capriole was reported as only $40,000 instead of the actual purchase price of $80,000. The record does not reflect whether YOC or Elvin paid the sales tax relating to the Capriole.

On the registration and the title documents relating to the Capriole, Elvin indicated that the Capriole was owned by YOC but also that the Capriole was to be used for "pleasure". On YOC's log and guest register, Elvin, not YOC, was indicated as owner of the Capriole.

The Capriole was listed on YOC's books and records as an asset included in YOC's used car inventory. During 1984 and

1985, however, at Elvin's direction, YOC's employees did not attempt to sell the Capriole. The log and guest register relating to the Capriole do not reflect any business use of the Capriole. The Capriole was used by Elvin on numerous occasions to entertain personal friends. Elvin invited guests to take pleasure cruises aboard the Capriole. Elvin and his guests used cocaine, marijuana, and alcohol during cruises aboard the Capriole.

During 1984 and 1985, respectively, YOC paid $90,635 and $133,179 in expenses for repairs, restoration, maintenance, and operation of the Capriole, and YOC deducted these expenses as business expenses. For 1983, 1984, and 1985, YOC did not claim depreciation deductions relating to the Capriole.

In July of 1989, the Capriole was traded to an unrelated party for real property located in Jackson County, North Carolina. The stated sale price for the Capriole was $186,500. The real property that was received in the exchange was treated by YOC as an asset of YOC. The record does not reflect whether a gain or loss was realized on this sale nor whether YOC reported the sale on its 1989 corporate Federal income tax return.

The parties have stipulated that for 1984 and 1985 the fair rental value for use of the Capriole was $1,200 per day.

On audit, respondent determined that YOC held only nominal legal title to the Capriole and that Elvin was the owner of the Capriole. Respondent determined that for 1984 the $80,000

provided by YOC for purchase of the Capriole represented a constructive dividend to Elvin. Respondent also determined that the Capriole was used by Elvin solely for his personal benefit. Respondent disallowed all of the $90,635 and $133,179 for 1984 and 1985 that were claimed by YOC as business expenses relating to the Capriole, and respondent determined that YOC's payment of these expenses represented constructive dividends to Elvin.

## The Sea Ray Boat

On October 1, 1981, YOC transferred to Elvin $9,575 for purchase from one of YOC's employees of a used 22-foot Sea Ray Boat (Sea Ray Boat). The Sea Ray Boat was purchased by Elvin for Elvin's personal use.

The Sea Ray Boat was listed on YOC's books and records as an asset and was included in YOC's used car inventory.

The Sea Ray Boat was used by Elvin, Elvin's son Buddy, and their friends for personal recreation. A log was not maintained relating to use of the Sea Ray Boat, and the evidence in the record does not reflect any business use of the Sea Ray Boat.

During 1983, YOC paid $1,155 for maintenance, repairs, and operation of the Sea Ray Boat. For income tax purposes, YOC did not deduct this $1,155 as a business expense.

During 1983, 1984, and 1985, in addition to the above $1,155, YOC paid and did claim business expense deductions of $2,077, $3,837, and $1,228, respectively, relating to the Sea Ray

Boat.  For 1983, 1984, and 1985, YOC did not claim depreciation deductions relating to the Sea Ray Boat.

On audit, respondent disallowed the expenses claimed by YOC for 1983, 1984, and 1985 relating to the Sea Ray Boat in the respective amounts of $2,077, $3,837, and $1,228.  Respondent also determined that these amounts represented constructive dividends to Elvin, and respondent determined that the $1,155 paid in 1983 that was not claimed by YOC as a business expense represented a constructive dividend to Elvin.

The Motor Home

On October 11, 1983, one of YOC's customers traded in a motor home on the purchase of a new automobile.  The motor home was then listed on YOC's books and records as an asset and was included in YOC's used car inventory at a cost of $10,000.  Elvin used the motor home for his personal use, and he instructed YOC's sales staff not to sell the motor home.  It is not clear from the record whether YOC claimed depreciation deductions relating to the motor home.

During 1983 and 1984, Elvin, for his personal use and benefit, had repairs and improvements made to the motor home at a cost of $10,697 and $16,802, respectively.  These repairs and improvements were paid for by YOC.  Of the $16,802 paid for

improvements to the motor home in 1984, $7,232 was paid to Mrs. Yarbrough for improvements to the motor home by Mrs. Yarbrough's interior decorating business.

Occasionally, the motor home was used in connection with YOC's business, but the majority of the use of the motor home represented Elvin's personal use. For example, Elvin used the motor home to travel to Sylva, North Carolina, to visit Buddy, and to travel to Los Angeles, California, to the 1984 Summer Olympics. No log or other record indicating the nature and extent of the use of the motor home was maintained.

Respondent disallowed the above expenses claimed by YOC for 1983 and 1984 relating to the motor home, and respondent determined that these expenses represented constructive dividends to Elvin.

## The Sylva Residence

In 1984, Elvin purchased for $67,500 a residence in Sylva, North Carolina, for Buddy's use while Buddy attended college at Western Carolina University (the Sylva Residence). Title to the Sylva Residence was placed in the name of Yarbrough Leasing, Inc. (Yarbrough Leasing), a family corporation owned by Mrs. Yarbrough (49 shares), by Buddy (49 shares), and by Elvin (2 shares).

On May 17, 1984, YOC transferred to Yarbrough Leasing a $65,000 check to provide most of the funds necessary to purchase

the Sylva Residence. YOC reflected on its books and records this $65,000 as an account receivable due from Yarbrough Leasing.

On May 18, 1984, either Elvin or Yarbrough Leasing made a partial repayment to YOC of $50,000. This $50,000 apparently represented a repayment to YOC of the $65,000 transferred by YOC the day before to Yarbrough Leasing.

On or about June 14, 1984, the purchase of the Sylva Residence was consummated.

On June 3, 1985, Elvin, nominally on behalf of Yarbrough Leasing, applied for a $55,000 loan from Northwestern Bank in Sylva, North Carolina. On June 26, 1985, proceeds from this loan of $54,586 were deposited into Yarbrough Leasing's checking account at Barnett Bank, and on the same day a check for $54,586 was issued by Yarbrough Leasing to Elvin. The Sylva Residence was used as collateral for the $55,000 loan.

During 1984 and 1985, Buddy resided in the Sylva Residence while he attended college. Buddy did not pay rent to Yarbrough Leasing for use of the Sylva Residence. A college friend of Buddy's also resided at the Sylva Residence and paid approximately $200 a month in rent directly to Elvin, not to Yarbrough Leasing.

With regard to the Sylva Residence, Elvin personally, not Yarbrough Leasing, was the named insured on the related homeowner's insurance policy.

The Sylva Residence was sold in February of 1991, and a small loss resulted from the sale.

On audit, respondent determined that the full $65,000 transferred from YOC to Yarbrough Leasing for purchase of the Sylva Residence represented a constructive dividend from YOC to Elvin, followed by a capital contribution of $65,000 from Elvin to Yarbrough Leasing.

Claimed Travel and Entertainment Expenses

During 1983, 1984, and 1985, miscellaneous personal expenses of Elvin and of Mrs. Yarbrough were paid by YOC, and these expenses were claimed on YOC's corporate Federal income tax returns as deductible business travel and entertainment expenses. On audit, a portion of these claimed travel and entertainment expenses was disallowed by respondent and treated as constructive dividends to Elvin in the amounts set forth below:

| Year | T and E Expenses Claimed on YOC's Return | Amount Disallowed and Treated as Constructive Dividends to Elvin |
|------|------------------------------------------|-----------------------------------------------------------------|
| 1983 | $31,048 | $22,014 |
| 1984 | 18,209 | 14,012 |
| 1985 | 30,510 | 22,080 |

Petitioners did not introduce any records or other credible evidence in support of the proposition that the above disallowed travel and entertainment expenses qualified as deductible business expenses of YOC or that they did not represent constructive dividends to Elvin.

Additional Personal Expenses of Elvin Paid by YOC
and Claimed by YOC as Deductible Business Expenses

During 1983 through 1986, YOC paid numerous additional personal expenses of Elvin that were claimed by YOC as deductible business expenses.  Elvin instructed YOC's employees to pay these expenses and to reflect these expenses in YOC's books and records as YOC's business expenses.

The schedules below set forth by year the amount of these additional personal expenses of Elvin that YOC paid and claimed as deductible business expenses.  The schedules also indicate the manner in which these expenses were reflected in YOC's books and records and the benefit that Elvin received as a result of the expenses.  On audit, respondent disallowed the business expense deductions claimed by YOC with respect to the expenses set forth in the schedules, and respondent treated them as constructive dividends to Elvin.  In a number of instances (identified as "Not deducted" in the column reflecting the manner in which the expenses were treated on YOC's books), respondent determined (with respect to certain expenses that were paid by YOC for Elvin's benefit but not deducted as business expenses by YOC) that such expenses represented constructive dividends to Elvin. The schedule also reflects which expenses petitioners now concede should be treated as nondeductible personal expenses and as constructive dividends to Elvin.

1983 -- ADDITIONAL PERSONAL EXPENSES OF ELVIN
THAT YOC PAID AND CLAIMED AS DEDUCTIBLE BUSINESS EXPENSES

| Amount | Recorded on YOC Books As | Benefit to Elvin | Conceded by Petitioners |
|---|---|---|---|
| $ 6,000 | Employee expense | 3 months' rent on California oceanfront property | No |
| 3,100 | Employee expense | Purchase of spa | Yes |
| 4,374 | Employee expense | Purchase of sauna | Yes |
| 2,393 | Repair expense | Installation of spa and sauna at Elvin's residence | Yes |
| 7,300 | Repair expense | Plastering and painting of Elvin's residence | Yes |
| 3,300 | Employee expense | Buddy's college rent | No |
| 8,901 | Employee expense | Rental of wind surfers, barbecue grill, microwave oven, and boat | No |
| 2,461 | Utility expense | Utility bills for Elvin's residence | Yes |
| 1,663 | Company vehicle expense | Gasoline credit cards used by Mrs. Yarbrough and Buddy | No |
| 1,945 | Miscella-neous expense | Expenses relating to Sea Ray Boat | No |
| 132 | Outside services expense | Expenses relating to Sea Ray Boat | No |
| 1,363 | Depreciation expense | Depreciation claimed by YOC on assets used personally by Elvin | No |
| 8,203 | Salary expense | Services of Elvin's housekeeper | No |

| | | | |
|---|---|---|---|
| 14,352 | Not deducted | YOC automobiles for personal use of Elvin, Mrs. Yarbrough, and Buddy | No |

Total

$65,487

### 1984 -- ADDITIONAL PERSONAL EXPENSES OF ELVIN
### THAT YOC PAID AND CLAIMED AS DEDUCTIBLE BUSINESS EXPENSES

| Amount | Recorded on YOC Books As | Benefit to Elvin | Conceded by Petitioners |
|---|---|---|---|
| $ 312 | Repairs expense | Kitchen improvements at Elvin's residence | Yes |
| 1,100 | Employee expense | Buddy's college rent in North Carolina | No |
| 668 | Employee expense | Elvin's medical bill | Yes |
| 3,281 | Utility expense | Utility bills on Elvin's residence | Yes |
| 2,179 | Company vehicle expense | Gasoline credit cards used by Mrs. Yarbrough and Buddy | No |
| 2,869 | Miscella- neous expense | Expenses relating to Sea Ray Boat | No |
| 968 | Outside services expense | Expenses relating to Sea Ray Boat | No |
| 10,600 | Salary expense | Elvin's housekeeper | No |
| 18,167 | Not deducted | YOC automobiles for personal use of Elvin, Mrs. Yarbrough, and Buddy | No |
| 915 | Depreciation expense | Depreciation claimed by YOC on assets used personally by Elvin | No |
| 383 | Insurance expense | Insurance on Capriole | No |

| Amount | | Interest | Interest on $80,000 | No |
|---|---|---|---|---|
| 2,053 | | expense | loan to purchase Capriole | |

| Total | | | | |
|---|---|---|---|---|
| | $43,495 | | | |

## 1985 -- ADDITIONAL PERSONAL EXPENSES OF ELVIN
## THAT YOC PAID AND CLAIMED AS DEDUCTIBLE BUSINESS EXPENSES

| Amount | Recorded on YOC Books As | Benefit to Elvin | Conceded by Petitioners |
|---|---|---|---|
| $ 2,227 | Repairs expense | Repairs on Elvin's personal residence | Yes |
| 22,708 | Not deducted | YOC automobiles for personal use of Elvin, Mrs. Yarbrough, and Buddy | No |
| 1,751 | Depreciation expense | Depreciation claimed by YOC on assets used personally by Elvin | No |
| 21,411 | Salary expense | Elvin's housekeeper and captain of Capriole | No |
| 4,084 | Company vehicle expense | Gasoline credit cards used by Mrs. Yarbrough and Buddy | No |
| 1,228 | Miscella- neous expense | Expenses relating to Sea Ray Boat | No |
| 6,242 | Outside services expense | Maintenance and operation of Capriole | No |
| 4,200 | Insurance expense | Insurance on Capriole | No |
| 10,947 | Interest expense | Interest on $80,000 loan to purchase Capriole | No |

| Total | $74,798 | | | |
|---|---|---|---|---|

## 1986 -- ADDITIONAL PERSONAL EXPENSES OF ELVIN
## THAT YOC PAID

| Amount | Recorded on YOC Books As | Benefit to Elvin | Conceded by Petitioners |
|--------|--------------------------|------------------|-------------------------|
| $15,136 | Not deducted | Repairs on Elvin's residence | No |

## Travel Awards

In 1983 and 1985, Elvin received travel awards from General Motors relating to the successful operation and profitability of YOC. In 1983, Elvin received a trip to Germany at a cost of $4,361. In 1985, Elvin and his wife received a trip to France and Switzerland at a cost of $10,087.

For both 1983 and 1985, Elvin did not provide his income tax return preparer any information regarding these travel awards, and no amount with respect to these travel awards was reported as income on Elvin's 1983 and 1985 Federal income tax returns.

On audit, respondent determined that costs of $4,361 in 1983 and $10,087 in 1985 relating to these travel awards represented income to Elvin under section 74(a).

## Elvin's Brain Tumor

On June 19, 1987, Elvin was diagnosed as having a tumor in the frontal lobe of his brain. The frontal lobe constitutes the area of the brain responsible for, among other things, the ability to perform executive functions and complex tasks, the ability to plan, remember, and carry out logical sequences of

behavior, to control emotions, to monitor impulsive behavior, and to formulate speech.

On June 19, 1987, the day on which Elvin was diagnosed with the brain tumor, Elvin complained to the attending doctor that he suffered from headaches, blurred vision, and impaired eye-hand coordination. Doctors who examined Elvin estimated that Elvin's brain tumor had been growing for a period of between 7 and 10 years.

On June 23, 1987, Dr. John S. Boggs surgically removed Elvin's brain tumor. The tumor was approximately 6 centimeters in diameter and was benign. The tumor destroyed a small part of Elvin's frontal lobe.

In spite of the brain tumor, during each of the years in issue (1983 through 1986), Elvin was responsible for and actually supervised day-to-day management and operations of YOC, and YOC became increasingly profitable. During these same years, Elvin was also responsible for and involved with other businesses and corporations, such as Yarbrough Leasing and NRDC.

During the years in issue, none of Elvin's coworkers or business associates noticed that Elvin suffered any signs of impaired mental abilities or impaired judgment. Elvin, from year to year, remembered customers' names and what models of automobiles they had purchased.

Some of Elvin's friends, however, did notice that Elvin occasionally missed meetings and appointments, that Elvin's

attention span had lessened, that his desire and ability to play golf had lessened, and that Elvin, at times, apparently had trouble concentrating and remembering.

After the brain tumor was removed, Elvin's ability to make business decisions and to manage business and financial matters was not impaired. During the past 7 to 8 years, Elvin has continued to be responsible for overall and day-to-day management and operations of YOC, and YOC has continued to constitute a successful business.

Criminal Tax Proceedings

On November 4, 1985, Elvin was advised that he was under criminal investigation for filing false Federal income tax returns. In late 1990 or early 1991, after completion of a criminal tax investigation by respondent of both Elvin and of YOC, Elvin was indicted for willfully attempting to evade payment of his personal Federal income taxes for 1983, 1984, 1985, and 1986 in violation of section 7201, and for willfully aiding and assisting in the preparation of false and fraudulent corporate Federal income tax returns of YOC for 1983, 1984, 1985, and 1986 in violation of section 7206(2). On January 2, 1991, Elvin pled guilty to one count each of the above criminal charges, both for 1983. As part of the plea agreement, the other criminal charges against Elvin with regard to 1984, 1985, and 1986 were dismissed.

With regard to Elvin's plea for 1983 under sections 7201 and 7206(2), the plea agreement contains the following language:

> Although * * * [Elvin] does not contest the Factual
> Basis for the plea which is incorporated herein, * * *
> [Elvin] as a result of a brain tumor, contends he is
> unwilling and unable to admit his participation in or
> criminal intent regarding the acts constituting the
> crime and maintains his innocence thereof.
> Nevertheless, * * * [Elvin] hereby represents to the
> Court that the guilty plea herein is entered by * * *
> [Elvin] voluntarily, knowingly and understandingly and
> further represents to the Court that * * * [Elvin's]
> interests require entry of a guilty plea and that the
> Factual Basis incorporated herein, as well as other
> evidence which * * * [Elvin] anticipates the United
> States would present at trial, contains strong evidence
> of guilt. * * * [Citations omitted.]

On July 11, 1991, Elvin was sentenced by the U.S. District Court for the Middle District of Florida (District Court) to 3 years in prison. Elvin's sentence was suspended, and Elvin was placed on probation for 5 years. The District Court placed two conditions on Elvin's probation in lieu of imprisonment: (1) That Elvin enter a treatment facility for mental health counseling; and (2) that Elvin pay all Federal income taxes, interest, and penalties found to be lawfully owed to respondent for the "years 1983 through and including the present" within 30 days after his release from the treatment facility.

Elvin's Income Tax Returns and Respondent's Audit Determinations

For each of the years 1983, 1984, 1985, and 1986, Elvin filed separate individual Federal income tax returns. Thereon, Elvin reported salary income from YOC of $119,380, $312,620, $272,365, and $259,958, respectively.

For 1983, 1984, 1985, and 1986, none of the expenses described above that were paid by YOC for Elvin's personal benefit were reported as income on Elvin's Federal income tax returns.  As indicated on audit, respondent determined that these expenses were incurred by YOC for Elvin's personal benefit and that they represented constructive dividends to Elvin.  The following schedule sets forth a summary, by category, of the constructive dividends that respondent determined Elvin received from YOC.  Each category reflects the manner in which the expenses were reflected on YOC's books and records.  For example, the "salary expense" category reflects the salary paid by YOC to the captain of the Capriole that respondent treated as nondeductible to YOC and as a constructive dividend to Elvin.

| Constructive Dividends Determined by Respondent Relating to | 1983 | 1984 | 1985 | 1986 |
|---|---|---|---|---|
| The YOC-Elvin Account | $137,673 | $ 17,510 | $ 64,825 | $258,939 |
| Capriole | - | 170,635 | 133,179 | - |
| Sea Ray Boat | 1,155 | - | - | - |
| Motor Home | 10,697 | 16,802 | - | - |
| Sylva Residence | - | 65,000 | - | - |
| Travel/Entertainment | 22,014 | 14,012 | 22,080 | - |
| Employee Benefits | 25,676 | 1,768 | - | - |
| Utilities | 2,461 | 3,281 | - | - |
| Company Vehicle Expense | 1,663 | 2,179 | 4,084 | - |
| Miscellaneous Expense | 1,945 | 2,869 | 1,228 | - |
| Repair Expense | 9,693 | 312 | 2,227 | - |
| Insurance Expense | - | - | - | - |
| Outside Services | 132 | 968 | 6,242 | - |
| Depreciation | - | - | 2,400 | - |
| Salary Expense | 8,203 | 10,600 | 21,411 | - |
| Interest Expense | - | 2,053 | 10,947 | - |
| Demonstrator Vehicles | 14,352 | 18,167 | 22,708 | - |
| Elvin's Residence | - | - | - | 15,136 |
| Total | $235,664 | $326,156 | $291,331 | $274,075 |

Respondent determined that for 1983, 1984, 1985, and 1986, Elvin received total constructive dividends from YOC of $235,664, $326,156, $291,331, and $274,075 (the taxable portion of which for 1986 is limited to $196,042 as a result of YOC's 1986 earnings and profits), respectively.

Also, as explained, respondent determined that for 1983 and 1985 Elvin received income in the form of travel awards received from General Motors of $4,361 and $10,087, respectively.

The schedule below reflects for 1983, 1984, 1985, and 1986 Elvin's taxable income as reported by Elvin on his Federal income tax returns, Elvin's taxable income as determined by respondent, and Elvin's underreported taxable income as determined by respondent (namely, Elvin's taxable income as determined by respondent less Elvin's reported taxable income).

| | Taxable Income | | |
|---|---|---|---|
| Year | As Reported by Elvin | As Determined by Respondent | Underreported Income as Determined by Respondent |
| 1983 | $103,285 | $434,279 | $330,994 |
| 1984 | 283,714 | 612,362 | 328,648 |
| 1985 | 219,427 | 520,845 | 301,418 |
| 1986 | 209,743 | 399,785 | 190,042 |

Respondent also determined that for 1983, 1984, 1985, and 1986, Elvin was liable for the fraud additions to tax, increased interest relating to fraud, and substantial understatement additions to tax.

YOC's Tax Returns and Respondent's Audit Determinations

For each of the years 1982 through 1986, YOC reported on its corporate Federal income tax returns total retained earnings of $118,956, $267,275, $515,486, $709,967, and $852,304, respectively.  During these years, however, YOC did not declare and pay any dividends to either Elvin or its other shareholder, Swisher.

For 1983, 1984, and 1985, in order to prepare the corporate Federal income tax returns, YOC's tax return preparer was given only YOC's general ledger.  Detail on specific expenses, reflected in YOC's journals, was not provided to the tax return preparer.  The tax return preparer was not requested to and did not audit YOC's books and records.

The schedule below reflects for 1983, 1984, and 1985, YOC's taxable income as reported on YOC's corporate Federal income tax returns, YOC's taxable income as determined by respondent,[1] and YOC's underreported taxable income as determined by respondent (namely, YOC's taxable income as determined by respondent less YOC's reported taxable income).

---

[1]     YOC's taxable income as determined by respondent is based on the adjustments described above and taking into account the fact that some of the adjustments described above were not claimed as business expense deductions on YOC's tax returns.

| | YOC's Taxable Income | | Underreported Income |
|---|---|---|---|
| Year | As Reported by YOC | As Determined by Respondent | as Determined by Respondent |
| 1983 | $132,021 | $205,171 | $73,150 |
| 1984 | 410,227 | 449,567 | 39,340 |
| 1985 | 308,762 | 382,932 | 74,170 |

For 1983, 1984, and 1985, respectively, the underreported income as determined by respondent was attributable to disallowed claimed business expenses of $73,150, $39,340, and $74,170.

Respondent also determined that for 1983, 1984, and 1985, YOC was liable for the fraud additions to tax, increased interest relating to fraud, and for the substantial understatement additions to tax.

OPINION

Claimed Business Expenses and Constructive Dividends

Numerous court opinions establish that if shareholders of a corporation receive corporate funds or corporate property for personal use, they will be charged with distributions from the corporation, taxable to them as constructive dividend income if the corporation has sufficient earnings and profits. Ireland v. United States, 621 F.2d 731, 735 (5th Cir. 1980); Loftin & Woodard, Inc. v. United States, 577 F.2d 1206, 1214 (5th Cir. 1978); Commissioner v. Riss, 374 F.2d 161, 166-167 (8th Cir. 1967), affg. in part, revg. in part, and dismissing in part T.C.

Memo. 1964-190; Melvin v. Commissioner, 88 T.C. 63 (1987), affd. per curiam 894 F.2d 1072 (9th Cir. 1990); Challenge Manufacturing Co. v. Commissioner, 37 T.C. 650, 663 (1962); American Properties, Inc. v. Commissioner, 28 T.C. 1100, 1115 (1957), affd. 262 F.2d 150 (9th Cir. 1958).  In addition, the corporation will not be allowed to deduct costs of owning and maintaining property and other expenses that are attributable to personal use of the property by the shareholders.  United Aniline Co. v. Commissioner, 316 F.2d 701, 705 (1st Cir. 1963), affg. T.C. Memo. 1962-60; Challenge Mfg. Co. v. Commissioner, supra at 663.

In determining whether constructive dividends have been received by a shareholder, the key factors to consider are whether the shareholder received economic benefit from the corporation without expectation of repayment therefor and whether corporate benefits made available to the shareholder represented benefits primarily of a personal nature and did not relate to the business of the corporation.  Ireland v. United States, supra at 735; Loftin & Woodard, Inc. v. United States, supra at 1215-1217. A mere declaration by a shareholder that a withdrawal was intended as a loan is insufficient if the transaction fails to meet more reliable indicia of debt.  Williams v. Commissioner, 627 F.2d 1032, 1034 (10th Cir. 1980), affg. T.C. Memo. 1978-306; Alterman Foods, Inc. v. United States, 505 F.2d 873, 876 (5th Cir. 1974).

Whether a shareholder withdrawal constitutes a bona fide loan or a dividend involves a question of fact that turns on a consideration of all of the surrounding facts and circumstances. Alterman Foods, Inc. v. United States, supra at 875. Some of the relevant facts are: (1) The extent to which the shareholder controls the corporation; (2) the earnings and dividend history of the corporation; (3) the magnitude of the withdrawal and whether a ceiling existed to limit the amount to be withdrawn from the corporation; (4) how the withdrawal was recorded on the books and records; (5) whether promissory notes were executed; (6) whether interest was paid or accrued; (7) whether security was given for the withdrawal; (8) whether there was a set maturity date; (9) whether the shareholder was in a position to repay the withdrawal; (10) whether the corporation ever undertook to enforce repayment; and (11) whether there was any indication the shareholder attempted to repay the amount withdrawn. Id. at 877 n.7; see also Dolese v. United States, 605 F.2d 1146, 1153 (10th Cir. 1979); Thielking v. Commissioner, T.C. Memo. 1987-227, affd. without published opinion 855 F.2d 856 (8th Cir. 1988).

Unfettered control of a corporation by a shareholder weighs in favor of a constructive dividend characterization, as does a corporate history of not declaring and paying dividends in spite of substantial earnings and profits. Busch v. Commissioner, 728

F.2d 945 (7th Cir. 1984), affg. T.C. Memo. 1983-98; <u>Thielking v.</u>
<u>Commissioner</u>, <u>supra</u>.

Shareholder repayments are evidence that a withdrawal from a
corporation constituted a loan.  The repayment, however, must be
bona fide.  <u>Crowley v. Commissioner</u>, T.C. Memo. 1990-636, affd.
962 F.2d 1077 (1st Cir. 1992).  Little weight need be given to
repayments that appear to be motivated by a tax audit.  <u>Crowley</u>
<u>v. Commissioner</u>, 962 F.2d at 1084.  Additionally, the fact that a
taxpayer made some repayments may be overshadowed where total
withdrawals each year, after repayments, steadily increase from
year to year.  See <u>Regensburg v. Commissioner</u>, 144 F.2d 41, 44
(2d Cir. 1944), affg. a Memorandum Opinion of this Court dated
Apr. 20, 1943; <u>Electric & Neon, Inc. v. Commissioner</u>, 56 T.C.
1324, 1339 (1971), affd. without published opinion 496 F.2d 876
(5th Cir. 1974); <u>Koufman v. Commissioner</u>, T.C. Memo. 1976-330.

Further, repayments that occur through bookkeeping entries
such as salary credits and credits for bonuses are given less
weight because such repayments are funded by the corporation.
<u>Busch v. Commissioner</u>, 728 F.2d 945 (7th Cir. 1984), affg. T.C.
Memo. 1983-98; <u>Estate of Taschler v. United States</u>, 440 F.2d 72,
76 (3d Cir. 1971).  In <u>Estate of Taschler</u>, the Court of Appeals
for the Third Circuit noted the following with regard to
repayments in the form of salary credits:

> Within limits, taxpayer had complete control over the
> amount of his salary payments.  He could have increased

or decreased them as he saw fit, and determined the time when they should be paid.  So whether amounts were or were not deducted from his salary payments is immaterial, for the net effect on * * * [the corporation's] financial status would have been the same.  They came from assets of the corporation.  [440 F.2d at 76.]

Interest charges and interest payments indicate an intent to repay, but the probative value of interest charges may be significantly reduced if the interest charges did not begin until after a tax audit was initiated.  Crowley v. Commissioner, supra; Offshore Operations Trust v. Commissioner, T.C. Memo. 1973-212.

In appropriate circumstances, the fair rental value of property includes all of the days on which the property is available for personal use, not just the days on which the property is so used.  Nicholls, North, Buse Co. v. Commissioner, 56 T.C. 1225, 1241 (1971); Offshore Operations Trust v. Commissioner, supra.

The YOC-Elvin Account -- Constructive Dividends

As explained, respondent determined that for 1983, 1984, 1985, and 1986, the amount of the net increase each year over the prior year in the outstanding balance of the YOC-Elvin Account should be treated not as a loan but as a constructive dividend to Elvin.  Respondent relies on the following factors.  The net increase each year in the YOC-Elvin Account reflected payments or transfers of funds by YOC for Elvin's personal benefit.  Elvin did not execute loan documents or promissory notes with regard

thereto.  There were no limits on the amount that Elvin could withdraw from YOC.  There were no fixed payment dates, nor was there a requirement that Elvin make repayments to YOC.  No interest was charged on the debit balance in the account until December of 1985 after Elvin was notified of respondent's criminal tax investigation.  No formal dividends were declared and paid to Elvin despite the annual increases in YOC's retained earnings, and Elvin completely controlled the business affairs and day-to-day operations of YOC.

Petitioners argue that Elvin always had an intent to repay the debit balance in the YOC-Elvin Account, that some repayments were made, that Swisher's minority interest in YOC acted as a check on the amounts Elvin could withdraw from YOC, that the lack of loan documents and promissory notes is not significant, that Elvin began to pay interest in December of 1985 when section 7872[2] was enacted, and therefore that the net increase each year in the YOC-Elvin Account represented loans, not constructive dividends.

Petitioners also argue (with regard to the $325,939 that was used by YOC in 1986 for the purchase of real property on which to locate the new Chrysler-Plymouth dealership to be owned by NRDC) that the $325,939 represented a loan by YOC to NRDC and was

---

[2]    Sec. 7872 requires interest income to be imputed to a taxpayer in certain circumstances involving loans with below market interest rates.

incorrectly reflected as an increase in the outstanding balance of the YOC-Elvin Account.  Petitioners also stress that after 1986 significant, additional repayments were made by Elvin to reduce the debit balance of the YOC-Elvin Account and that respondent has not given Elvin credit for these later repayments.

Weighing all of the relevant facts in this case, we agree with respondent's determinations.  We conclude that for each year in issue, the YOC-Elvin Account did not constitute a valid loan account and that the net increase each year in the outstanding debit balance of the YOC-Elvin Account represents a constructive dividend to Elvin (namely, for 1983 -- $137,673, for 1984 -- $17,510, for 1985 -- $64,825, and for 1986 -- $258,939).

Elvin's self-serving testimony that he withdrew money from YOC in good faith and that he intended to fully repay YOC is entitled to little weight.  See Williams v. Commissioner, 627 F.2d 1032 (10th Cir. 1980), affg. T.C. Memo. 1978-306.  With regard to the YOC-Elvin Account, no loan documents or other promissory notes were executed, no maturity dates existed, no repayment dates were established, and no limits were placed on the amount of funds that Elvin could withdraw from YOC for his personal benefit.  Elvin did not provide any collateral to secure the transfers that YOC made to Elvin.

YOC's retained earnings increased substantially each year, but YOC did not declare or pay any dividends. Instead, Elvin appears to have had unlimited use of YOC's funds for his personal benefit.

Elvin owned a majority of the outstanding stock of YOC, and Elvin was solely responsible for day-to-day operations and management of YOC. Swisher was a silent partner, and there is no evidence that Swisher's minority interest in YOC in any way limited the amount of funds Elvin could withdraw from YOC.

Most, if not all, of the debits or increases to the YOC-Elvin Account resulted from payments or transfers of funds made by YOC for Elvin's personal use. The payment of Elvin's utility bill for his residence, the transfer of cash to Elvin, the rental of a vacation condominium for Elvin and his family, and improvements to Elvin's residence are examples of the personal nature of Elvin's expenses that were paid by YOC.

Interest was not charged on the YOC-Elvin Account until December of 1985, after Elvin was notified by respondent that a criminal tax investigation of Elvin had begun.

The outstanding debit balance in the YOC-Elvin Account increased each year and at no time did repayments exceed the amounts withdrawn.

With regard to the $325,939 debited in 1986 to the YOC-Elvin Account in connection with the purchase of real property for the new Chrysler-Plymouth dealership, YOC did not have an ownership

interest in this real property, which was purchased in the name of NRDC.  Elvin and Koons were the sole shareholders of NRDC.  We do not find it particularly significant that in 1987 YOC's outside accounting firm transferred the $325,939 debit from the YOC-Elvin Account to an account receivable due from NRDC in that amount.

There is no credible evidence that the $325,939 debited in 1986 to the YOC-Elvin Account was intended to be a loan to NRDC. Petitioners did not introduce into evidence any books and records of NRDC supporting their argument that the $325,939 was intended to be a loan to NRDC, and there was no explanation at trial as to why the records of NRDC were not produced at trial.  Further, there is no indication in YOC's books and records indicating that NRDC made any repayments to YOC of the $325,939.

We conclude that the $325,939 that YOC provided for purchase of the real property should be treated as a constructive dividend to Elvin, followed by a $325,939 contribution by Elvin to the capital of NRDC.  See Sammons v. Commissioner, 472 F.2d 449 (5th Cir. 1972).

Many of the credits or repayments reflected in the YOC-Elvin Account related to YOC's declaration of salary adjustments or bonuses to Elvin.  These credits are not entitled to significant weight in our consideration of how to treat the annual net increase in the YOC-Elvin Account.  See Epps v. Commissioner,

T.C. Memo. 1995-297; <u>Boecking v. Commissioner</u>, T.C. Memo. 1993-497.

We conclude that the annual net increase each year in the outstanding debit balance of the YOC-Elvin Account is to be treated as a constructive dividend to Elvin.  Respondent gave Elvin credit for all repayments reflected in the YOC-Elvin Account during the years in issue.  We agree with respondent's determination of the amount of constructive dividends charged to Elvin.  We conclude and hold that Elvin received from YOC constructive dividend income for 1983, 1984, 1985, and 1986 of $137,673, $17,510, $64,825, and $258,939 (the taxable portion of which for 1986 is limited to $196,042 as a result of YOC's 1986 earnings and profits), respectively, relating to the annual net increase in the YOC-Elvin Account.

The Yacht Capriole -- Claimed Business Expenses
<u>and Constructive Dividends</u>

Petitioners note that title to the <u>Capriole</u> was held in the name of YOC, and petitioners argue that Elvin entertained business associates and potential customers on the <u>Capriole</u>, that business discussions with YOC employees were conducted on the <u>Capriole</u>, that the <u>Capriole</u> was used a majority of the time for business, and that YOC did not attempt to sell the <u>Capriole</u> because YOC expected to make a profit in later years on appreciation of the <u>Capriole</u>.

Elvin is to be treated as owner of the <u>Capriole</u>.  Elvin purchased and used the <u>Capriole</u> solely for personal use.  During

1984 and 1985, the Capriole was at all times available for Elvin's personal use.  Elvin personally guaranteed the $80,000 loan, and the loan proceeds of $79,880 were used by Elvin to purchase the Capriole.

It is significant that Elvin created false documentation to reflect incorrectly that the Capriole was received by YOC as a trade-in on a new automobile.  On the log book and on the guest register, Elvin, not YOC, was indicated as owner of the Capriole.

YOC paid all of the expenses relating to the Capriole, and YOC deducted these expenses in 1984 and 1985 as business expenses.  All of the payments made by YOC relating to the Capriole benefited Elvin personally.

We conclude that although YOC held nominal legal title to the Capriole, Elvin is to be treated as the owner thereof.  The $80,000 transferred from YOC to Elvin to provide funds to purchase the Capriole are to be treated as a constructive dividend to Elvin.  Additionally, the $90,635 for 1984, and the $133,179 for 1985, claimed as business expenses relating to the Capriole are disallowed to YOC and are treated as constructive dividends to Elvin.

Even if we were to conclude that YOC should be treated as owner of the Capriole, the fair rental value of the Capriole for the two years that the Capriole was available for Elvin's use would be approximately $438,000 per year ($1,200 daily rental value times 365 days), which is more than the constructive

dividend relating to the Capriole determined by respondent for 1984 and 1985. See Nicholls, North, Buse Co. v. Commissioner, 56 T.C. 1225, 1241 (1971).

The Sea Ray Boat -- Claimed Business Expenses
and Constructive Dividends

Respondent argues that Elvin should be treated as owner of the Sea Ray Boat and that YOC held mere nominal legal title to the boat. Respondent observes that Elvin negotiated for the purchase of the boat, that the boat was not traded in on a new automobile, that the seller of the boat understood he was selling the boat to Elvin for Elvin's personal use, that after purchase of the boat YOC's employees did not attempt to resell the boat, that the boat was used solely for Elvin's personal use, and that a log was not kept reflecting any business use of the boat.

Petitioners argue that YOC should be treated as owner of the Sea Ray Boat. Petitioners argue that title to the boat was in the name of YOC and that the Sea Ray Boat was used for business.

Although YOC provided the funds necessary for Elvin to purchase the Sea Ray Boat, the Sea Ray Boat was used solely for Elvin's personal use. The record does not reflect any business use of the Sea Ray Boat.

We conclude that Elvin is to be treated as the owner of the Sea Ray Boat. The business expense deductions of $2,077, $3,837, and $1,228, that YOC claimed for 1983, 1984, and 1985, relating to the Sea Ray Boat are disallowed and are to be treated

as constructive dividends to Elvin.  We also conclude that Elvin received a constructive dividend of $1,155 for maintenance, repairs, and operation of the Sea Ray Boat that were paid by YOC in 1983 but that were not deducted by YOC as a business expense.

The Motor Home -- Claimed Business Expenses
and Constructive Dividends

Petitioners argue that because YOC received the motor home in trade on the sale of a new automobile and because Elvin used the motor home primarily for business, the motor home should be treated as an asset of YOC and expenses associated with the motor home should be treated as deductible business expenses of YOC.

Respondent argues that the motor home should be treated as Elvin's property and that Elvin used the motor home almost exclusively for personal use.  Respondent therefore concludes that the full $10,000 cost of the motor home should be treated as a constructive dividend to Elvin.  Respondent also argues that the $10,697 in 1983 and the $16,802 in 1984 paid by YOC for maintenance, improvement, and operation of the motor home should be disallowed as business expenses of YOC and should be treated as constructive dividends to Elvin.

We agree with petitioner as to ownership of the motor home, but we agree with respondent as to its use and as to the various expenses related thereto.

YOC received the motor home as a trade-in on the purchase of a new automobile in a valid business transaction, and the motor

home was used occasionally in YOC's business.  We conclude that YOC is to be treated as the owner of the motor home.

Petitioners, however, did not offer any records or other documentation to substantiate the specific business use of the motor home, and the record does reflect substantial personal use by Elvin of the motor home.

We conclude with regard to the motor home that the expenses of $10,697 in 1983 and $16,802 in 1984 paid by YOC for maintenance, improvement, and operation of the motor home are not deductible business expenses of YOC, and Elvin is to be treated as receiving constructive dividends in those amounts.

The Sylva Residence -- Constructive Dividends

Petitioners argue that the $65,000 used by Elvin in 1984 to purchase the Sylva Residence represented a loan by YOC to Yarbrough Leasing, not a constructive dividend to Elvin. Respondent argues that the $65,000 should to be treated as a constructive dividend to Elvin.

The Sylva Residence was purchased as a residence for Elvin's son Buddy while Buddy attended college.  During 1984 and 1985, Elvin received rental payments of $200 per month from Buddy's roommate, who also resided at the Sylva Residence.

Although the YOC check for $65,000 that was used to purchase the Sylva Residence was made payable to Yarbrough Leasing, Elvin, in substance and effect, withdrew the $65,000 from YOC and

transferred that amount as a capital contribution to Yarbrough Leasing in order to provide Yarbrough Leasing the funds necessary to purchase the Sylva Residence. See Sammons v. Commissioner, 472 F.2d 449 (5th Cir. 1972), affg. in part and revg. in part T.C. Memo. 1971-45.

In calculating the amount of the constructive dividend to be charged to Elvin relating to the Sylva residence, respondent did not give Elvin credit for a $50,000 repayment that was made by Elvin or by Yarbrough Leasing the day after the $65,000 was transferred to Yarbrough Leasing. This treatment by respondent is inconsistent with the treatment that respondent gave to payments made by Elvin on the debit balance in the YOC-Elvin Account. As explained, respondent, with regard to the YOC-Elvin Account, in each year charged Elvin only with constructive dividends for the annual net increase in the outstanding balance on the YOC-Elvin Account.

We conclude that only $15,000 of the $65,000 (namely, the $65,000 transferred by YOC to Yarbrough Leasing less the $50,000 repayment) relating to the Sylva Residence should be treated as a constructive dividend to Elvin.

Travel and Entertainment Expenses -- Claimed Business Expenses and Constructive Dividends

Petitioners argue that for 1983, 1984, and 1985, the expenses of $22,014, $14,012, and $22,080, respectively, incurred by YOC for Elvin's travel and entertainment qualify as valid

business expenses.  Petitioners argue that Elvin, on behalf of YOC, entertained potential customers, some of whom purchased new automobiles from YOC on an annual basis.  Petitioners argue that General Motors encouraged Elvin to entertain potential customers and that entertainment was a necessary expense to attract purchasers of high-priced Cadillac automobiles.

Respondent argues that petitioners have not substantiated the business, as opposed to the personal, nature of any of the claimed travel and entertainment expenses that respondent disallowed and treated as constructive dividends to Elvin.

Petitioners have not offered any documentary evidence or other credible substantiation to support the business nature of the claimed travel and entertainment expenses disallowed by respondent.

We sustain respondent's determination that for 1983, 1984, and 1985, the claimed travel and entertainment expenses of $22,014, $14,012, and $22,080, respectively, are to be disallowed, and Elvin is to be treated as receiving constructive dividends for the same years and in the same amounts.

Additional Personal Expenses of Elvin Paid by YOC -- Claimed Business Expenses and Constructive Dividends

Petitioners make no persuasive argument and offer no credible evidence that any of the expenses in question under this category (1983 -- $65,487; 1984 -- $43,495; 1985 -- $74,798; and 1986 -- $15,136) qualify as valid business expenses of YOC.  Many

of these expenses relate to Elvin's residence and his family, such as the payments made to Elvin's housekeeper, and gasoline credit cards used by Elvin and his family for personal travel.

We sustain in full respondent's disallowance to YOC of these claimed business expenses, and we sustain respondent's determination that these payments by YOC should be treated as constructive dividends to Elvin.

## Travel Awards

Generally, gross income includes the value of prizes and awards. Sec. 74(a).

Petitioners argue that the cost of the trips to Europe should not be treated as income to Elvin because the trips were related to the business of YOC and because on each trip Elvin attended conferences regarding the automobile business. The evidence, however, indicates that these trips actually represented promotional awards received by Elvin from General Motors. The business necessity associated with these trips has not been established.

We conclude that the cost of the travel awards received by Elvin from General Motors represents taxable income to Elvin.

## Additions to Tax

Respondent determined that as to Elvin for each of the years 1983, 1984, 1985, and 1986, and as to YOC for each of the years 1983, 1984, and 1985, the fraud addition to tax should apply.

For 1983, 1984, and 1985, if any portion of a tax underpayment is attributable to fraud, the addition to tax for fraud under section 6653(b)(1) equals 50 percent of the total underpayment of tax, and the increased interest under section 6653(b)(2) equals 50 percent of the interest payable under section 6601 but only with respect to that portion of the underpayment that is attributable to fraud.

For 1986, the addition to tax for fraud under section 6653(b)(1)(A) equals 75 percent of only that portion of a tax underpayment that is attributable to fraud, and the increased interest under section 6653(b)(1)(B) equals 50 percent of the interest payable under section 6601 with respect to the portion of the underpayment that is attributable to fraud.  Sec. 6653(b)(1)(A) and (B).

Respondent has the burden of proof on the fraud addition to tax.  Sec. 7454(a); Rule 142(b).  To satisfy this burden of proof, respondent must prove by clear and convincing evidence each of the following elements of tax fraud under section 6653: (1) That the taxpayer underpaid taxes owed for each year; and (2) that some part of the underpayment for each year is due to fraud.  King's Court Mobile Home Park, Inc. v. Commissioner, 98 T.C. 511, 515 (1992).

Fraud consists of an intentional wrongdoing for the purpose of avoiding the payment of taxes known to be owed.  Stoltzfus v. United States, 398 F.2d 1002, 1004 (3d Cir. 1968); DiLeo v.

Commissioner, 96 T.C. 858, 874 (1991), affd. 959 F.2d 16 (2d Cir. 1992); Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983). The existence of fraud is a question of fact to be resolved upon consideration of the entire record. Parks v. Commissioner, 94 T.C. 654, 660 (1990); Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978); Beaver v. Commissioner, 55 T.C. 85, 92 (1970).

A pattern of consistent underreporting of income may indicate fraud, as does the failure to maintain adequate records of income and expenses. Holland v. United States, 348 U.S. 121, 137 (1954); Korecky v. Commissioner, 781 F.2d 1566, 1568 (11th Cir. 1986), affg. T.C. Memo. 1985-63; Lollis v. Commissioner, 595 F.2d 1189, 1192 (9th Cir. 1979), affg. T.C. Memo. 1976-15; Grosshandler v. Commissioner, 75 T.C. 1, 20 (1980); Otsuki v. Commissioner, 53 T.C. 96, 109 (1969).

The use of a corporation to disguise the personal nature of expenses constitutes an indicium of fraud. Truesdell v. Commissioner, 89 T.C. 1280, 1302-1303 (1987); Benes v. Commissioner, 42 T.C. 358, 383 (1964), affd. 355 F.2d 929 (6th Cir. 1966).

A corporation can act only through its officers and does not escape responsibility for acts of its officers performed in that capacity. DiLeo v. Commissioner, supra at 875; Federbush v. Commissioner, 34 T.C. 740, 749 (1960), affd. 325 F.2d 1 (2d Cir. 1963). It follows that corporate fraud is established through

the fraudulent acts and intent of corporate officers. Auerbach Shoe Co. v. Commissioner, 216 F.2d 693 (1st. Cir. 1954), affg. 21 T.C. 191 (1953); DiLeo v. Commissioner, supra; Federbush v. Commissioner, supra.

Generally, courts have recognized that in limited situations, because of mental incapacity or disease, a taxpayer may not have the requisite fraudulent intent. See Farber v. Commissioner, 43 T.C. 407, 421-422 (1965); Hollman v. Commissioner, 38 T.C. 251, 259-260 (1962).

We concluded in a prior opinion in these consolidated cases that for 1983 Elvin, but not YOC, is collaterally estopped from denying civil tax fraud. Yarbrough Oldsmobile Cadillac, Inc. v. Commissioner, T.C. Memo. 1993-20. We therefore must now decide whether Elvin is liable for the fraud additions to tax for 1984, 1985, and 1986, and whether YOC is liable for the fraud additions to tax for 1983, 1984, and 1985.

Petitioners, as indicated above, disagree with the substantive merit of many of the adjustments respondent has made, and petitioners therefore argue that no significant underpayment of tax was reflected on petitioners' and on YOC's Federal income tax returns as filed.

Petitioners also argue that the adverse effects of Elvin's brain tumor precluded Elvin from forming any fraudulent intent. Petitioners argue that, in the preparation of the tax returns, Elvin relied on YOC's accountant, that Elvin did not sign YOC's

1984 and 1985 corporate Federal income tax returns, and that Elvin is not sophisticated in tax matters.

In support of the contention that both Elvin and YOC filed fraudulent Federal income tax returns for the years in issue, respondent argues that the correct taxable income on each of the individual and corporate tax returns in question was significantly underreported, that Elvin had the mental capacity in 1983 through 1986 to form fraudulent intent, that Elvin for 1983 was convicted under section 7201 of Federal income tax evasion and under section 7206(2) of filing a false and fraudulent corporate Federal income tax return for YOC, that the same activities and course of conduct that were present in 1983 and that formed the factual basis for Elvin's convictions for 1983 were continued by Elvin in 1984, 1985, and 1986, that Elvin followed a pattern of consistent underreporting of income, that Elvin caused YOC to pay many of his personal expenses and to purchase personal assets, and that YOC followed a pattern of consistent underreporting of income.

Based on our many findings and conclusions herein sustaining respondent's substantive tax adjustments, it is clear that respondent has shown that very substantial underreporting of income and underpayments of Federal income taxes occurred on Elvin's and on YOC's Federal income tax returns for the years at issue.

The schedule below reflects for 1983, 1984, 1985, and 1986, Elvin's taxable income as reported by Elvin on his Federal income tax returns, Elvin's taxable income as sustained by us, and the amount of taxable income underreported by Elvin (namely, Elvin's taxable income as sustained by us less Elvin's reported taxable income).

| | Elvin's Taxable Income | | |
|---|---|---|---|
| Year | As Reported by Elvin | As Sustained by the Court | Underreported Taxable Income |
| 1983 | $103,285 | $434,279 | $330,994 |
| 1984 | 283,714 | 612,362 | 328,648 |
| 1985 | 219,427 | 520,845 | 301,418 |
| 1986 | 209,743 | 399,785 | 190,042 |

The schedule below reflects for 1983, 1984, and 1985, YOC's taxable income as reported by YOC on its corporate Federal income tax returns, YOC's taxable income as sustained by us, and the amount of taxable income underreported by YOC (namely, YOC's taxable income as sustained by us less YOC's reported taxable income).

| | YOC's Taxable Income | | |
|---|---|---|---|
| Year | As Reported by YOC | As Sustained by the Court | Underreported Taxable Income |
| 1983 | $132,021 | $205,171 | $73,150 |
| 1984 | 410,227 | 449,567 | 39,340 |
| 1985 | 308,762 | 382,932 | 74,170 |

Based on the underreported taxable income, as reflected above, the first element of the fraud addition to tax has been established as to both Elvin and YOC for each year in dispute.

With regard to the allegation that Elvin's brain tumor precluded Elvin from forming the requisite fraudulent intent, both parties offered expert medical testimony. Unfortunately, none of the expert witnesses examined Elvin before June 23, 1987, the day the brain tumor was removed.

Petitioners' first expert witness is a neurosurgeon. He examined Elvin two times, once in July of 1990 (3 years after the brain tumor was removed), and once in March of 1994 (shortly before trial herein). He testified that brain tumors in certain parts of the brain may cause behavioral abnormalities and that when the frontal lobe of the brain is intruded on or destroyed, there likely will be some degree of dementia, which is a decrease in intellectual function.

Petitioners' first expert witness concluded that a brain tumor such as Elvin's may cause a change in personality, an inability to plan for the future, and a decrease in the ability to remember and to make rational judgments. He acknowledged that the use of drugs and alcohol may intensify the physical and mental changes caused by a brain tumor. In offering his opinion, he relied extensively on broad theories of expected behavioral changes associated with a brain tumor in the frontal lobe, and he

acknowledged that the degree of dementia that occurs is not the same in every individual.

Petitioners' second expert witness is a physician specializing in general psychiatry who conducted approximately 35 therapy sessions with Elvin after Elvin's brain tumor was removed. His sessions with Elvin were for post-operative therapy relating to Elvin's depression, not for evaluation of Elvin's behavior during the years in issue.

Petitioners' second expert witness testified that, in his opinion, Elvin's moods and behavior were significantly affected by the brain tumor and by its removal. He acknowledged that Elvin's use of drugs and alcohol could have influenced Elvin's behavior during the years in issue and that the criminal investigation pending against Elvin at the time of his sessions with Elvin could have affected Elvin as well.

Petitioners' third expert witness is a psychiatrist. He examined Elvin for 2-1/2 hours in 1988 and conducted several follow-up examinations. He also reviewed reports prepared by other doctors and other background material. Besides his interviews with Elvin, he did not speak to anyone about Elvin's behavior during the years in issue. He opined that Elvin's brain tumor would have had a negative effect on Elvin's judgment and behavior. He acknowledged that the criminal investigation pending against Elvin at the time of his interviews with Elvin could have affected Elvin.

Respondent's expert witness is a forensic psychiatrist. He has published on the subject of brain tumors. He reviewed all of the reports of petitioners' expert witnesses, and he reviewed information obtained from Elvin's coworkers, associates, and friends. He met with Elvin, and he observed the testimony of all of the witnesses at trial.

Respondent's expert witness testified that because brain tissue does not regenerate, if it is destroyed, it will not grow back. Consistent therewith, he testified that if deficiencies in Elvin's judgment and behavior existed during the years in issue because of damage the tumor had done to Elvin's brain, those deficiencies would not disappear upon removal of the tumor. He opined that, because Elvin does not today suffer from a defect in reasoning or judgment that impairs his ability to manage his very successful automobile dealership, to make business decisions, and to understand his responsibility to pay his Federal income taxes, during the years in issue Elvin did not suffer from any such defect.

Respondent's expert witness opined that in light of all of the evidence of Elvin's past and present behavior, Elvin's brain tumor, during the years in issue, did not impair Elvin's judgment as to financial and tax matters. He opined that Elvin was competent and was not mentally impaired during the years in issue.

Some of Elvin's acquaintances testified that, during the years in issue, Elvin would forget scheduled appointments and that his golf game suffered. Elvin's coworkers and business associates, however, testified that Elvin, during the years in issue, appeared mentally sharp, was able to make rational business decisions and to manage YOC, and that he appeared otherwise mentally normal.

During the years in issue, under Elvin's personal direction, control, and management, YOC became increasingly more profitable. Elvin organized several corporations, entered into contracts to purchase real property, and negotiated with lending institutions for loans. According to YOC's employees, with whom Elvin met regularly to review YOC's financial records, during the years in issue, Elvin understood tax matters. At several points of time during the years in issue, Elvin was advised by YOC's employees that the YOC-Elvin Account might not be treated as a loan account if YOC was audited by respondent.

During the years in issue, Elvin continued to manage his business dealings and financial transactions. Elvin was considered competent in 1987 by a District Court to enter a plea of guilty for 1983 to violation of sections 7201 and 7206(2).

We believe that, during the years in issue, as a result of the continual growth of the brain tumor Elvin suffered some physical ailments, including headaches and loss of vision, but we do not believe that these conditions resulted in an impairment of

Elvin's ability to make rational decisions, nor of Elvin's ability to understand the requirement of filing true and correct Federal income tax returns. During the years in issue, Elvin apparently never went to see a doctor, and Elvin apparently never complained of any physical or mental ailments other than headaches and, in early 1987, of blurred vision.

In our opinion, petitioners' expert witnesses did not adequately take into account Elvin's behavior during the years in issue. Petitioners' expert witnesses opined generally that because of the size of the brain tumor and because of its location in the frontal lobe of the brain, Elvin's judgment and behavior must have been or would likely have been impaired. Their opinions are inconsistent with the evidence before us.

Respondent's expert witness' opinion, however, was consistent with the objective evidence in the record. He was a particularly credible expert witness, and we agree with his opinion.

On the record before us, we conclude that during the years in issue Elvin was capable of forming the intent to commit fraud and that he did not suffer from a mental or physical disease or defect that would negate that intent.

Elvin instructed YOC's employees to pay his personal expenses and to record those payments on YOC's books and records as the payment of business expenses. Elvin did not report these payments as income on his individual Federal income tax returns.

Elvin disguised his personal expenses as YOC's business expenses. Elvin also used YOC funds to purchase personal assets (e.g., the Capriole and the Sea Ray Boat) and to pay expenses associated with those assets.

Elvin had substantial experience in business and financial activities. During the years in issue, under Elvin's direction and control, YOC's profits increased significantly each year. Elvin was advised by YOC's accountants that it was inappropriate and risky to pay personal expenses with corporate funds. Elvin did not take this advice, and he continued to use YOC's funds for his personal benefit.

In light of the evidence before us, it is evident, and we so hold, that Elvin knew that he received taxable income substantially in excess of that reported on his 1983, 1984, 1985, and 1986 Federal income tax returns and that Elvin consciously intended to commit fraud when those returns were filed. We conclude that Elvin filed fraudulent Federal income tax returns for 1984, 1985, and 1986.

The same conduct that forms the basis for Elvin's liability for fraud relates to YOC's liability for fraud for 1983, 1984, and 1985. A corporation can only act through its officers. See DiLeo v. Commissioner, 96 T.C. 858, 875 (1991). Elvin was responsible for the day-to-day operation of YOC, and Elvin was involved in all major business decisions that were made on behalf

of YOC, and Elvin instructed YOC's employees to pay his personal expenses.

Every adjustment that we have sustained in this case relates to transactions that occurred between Elvin and YOC. Elvin also signed YOC's 1983 corporate Federal income tax return. Although Elvin did not sign YOC's 1984 and 1985 corporate Federal income tax returns, Elvin was advised by YOC's employees to stop paying personal expenses with YOC's funds. In light of the evidence in this case, it is evident, and we so hold, that Elvin's conduct led to the filing of fraudulent corporate Federal income tax returns of YOC and that Elvin had knowledge of the erroneous items that were reported thereon.

For 1983, 1984, and 1985, we conclude that Elvin was fully aware of the falsity of and of the underreporting of income that were reflected on YOC's income tax returns.

Respondent has established by clear and convincing evidence that some portion of Elvin's income tax deficiencies for 1983, 1984, 1985, and 1986, and of YOC's income tax deficiencies for 1983, 1984, and 1985 is due to fraud. For 1983, 1984, and 1985, respondent, under section 6653(b)(1), need only prove that some portion of the underpayment is due to fraud. Therefore, for 1983, 1984, and 1985, Elvin and YOC are liable for the section 6653(b)(1) additions to tax for fraud on the entire underpayments that we have determined herein.

We must now determine what portion of the underpayments is attributable to fraud for 1983, 1984, 1985, and 1986. We must make this determination because, as explained, for 1983, 1984, and 1985, the section 6653(b)(2) increased interest for fraud applies only to the portion of the underpayment that is attributable to fraud. Moreover, for 1986, the entire fraud addition to tax applies only to the portion of the underpayment that is attributable to fraud. Sec. 6653(b)(1)(A) and (B).

For 1983, 1984, and 1985, for purposes of the section 6653(b)(2) increased interest for fraud, respondent has the burden of proving by clear and convincing evidence the portion of the underpayment attributable to fraud. Sec. 7454(a); Rule 142(b). For 1986, after respondent proves that some portion of the underpayment is attributable to fraud, the entire underpayment is treated as attributable to fraud, except as to any portion which the taxpayer proves is not attributable to fraud. Sec. 6653(b)(2); Houser v. Commissioner, T.C. Memo. 1995-330.

We now address that question with regard to each of the various adjustments that we have sustained herein.

Fraud- and Non-Fraud-Related Adjustments Relating to Elvin

With regard to Elvin, we conclude that for 1983, 1984, 1985, and 1986, the adjustments relating to the YOC-Elvin Account are not attributable to fraud. During the years in issue and prior to respondent's audit, Elvin made some significant repayments on

the balance in the account, disclosed the account on YOC's books and records, and after the criminal tax investigation was initiated, began to pay interest on the account.

With regard to the Capriole and the Sea Ray Boat, we conclude that adjustments relating thereto are attributable to fraud. The Capriole and the Sea Ray Boat effectively constituted Elvin's personal assets, and YOC held mere nominal legal title thereto. Elvin used the Capriole and the Sea Ray Boat exclusively for personal use. All of the expenses incurred by YOC for the Capriole and the Sea Ray Boat related to Elvin's personal use. Elvin created false documentation to make it appear as if YOC received the Capriole in trade for a new automobile.

The adjustments relating to the motor home are not attributable to fraud. The motor home was received by YOC in trade on a new automobile in a valid business transaction. YOC owned the motor home. There is evidence in the record that the motor home was used some of the time for business purposes.

The adjustments relating to the Sylva Residence are not attributable to fraud. Petitioners presented some evidence to the effect that the $65,000 transferred by YOC to purchase the Sylva Residence represented a loan to NRDC instead of a constructive dividend to Elvin. Essentially, simultaneously with the transfer of the $65,000, a $50,000 repayment was made by

Elvin or by Yarbrough Leasing to YOC relating to the Sylva Residence.

The adjustments relating to the travel and entertainment expenses are not attributable to fraud. There is some evidence that indicates that General Motors encouraged Elvin to entertain customers and that Elvin in fact entertained prospective customers and repeat customers. We sustained respondent's adjustments relating to travel and entertainment expenses because petitioners did not offer adequate substantiation.

Respondent has not met her burden of proving that the adjustments relating to the travel awards are attributable to fraud. Petitioners argue that the trips to Europe represented business travel and that Elvin attended meetings relating to the automobile business. Although it may have been negligent for Elvin to exclude these travel awards from his income, we do not, in this case, believe it was fraudulent.

The remaining adjustments for 1983, 1984, 1985, and 1986 relate to YOC's payment of Elvin's personal expenses and to other benefits that YOC provided to Elvin.[3] The schedules supra pp. 22-24 reflect the inherently personal nature of many of these expenses. We conclude that respondent has met her burden of

---

[3] These adjustments include employee benefits expense, utilities expense, company vehicle expense, miscellaneous expense, repair expense, outside services expense, depreciation, salary expense, interest expense, demonstrator vehicles, and improvements to Elvin's personal residence.

proving for 1983, 1984, 1985, and 1986 that these remaining adjustments are attributable to fraud.

Fraud- and Non-Fraud-Related Adjustments Relating to YOC

With regard to YOC, with the exception of the travel and entertainment expenses, we believe and we so hold, that for 1983, 1984, and 1985 all of the adjustments relating to YOC that we have sustained relating to the claimed business expenses of YOC are attributable to fraud.

Respondent, however, has not met her burden of proving that the erroneously claimed travel and entertainment expenses are attributable to fraud.

The schedule set forth as an appendix to this opinion provides separately for Elvin and for YOC a summary of the adjustments we have sustained, the year and amount of the adjustments, and a summary of which adjustments we conclude are and are not attributable to fraud.

Substantial Understatement Addition to Tax

Respondent also determined that Elvin (for 1983, 1984, 1985, and 1986) and YOC (for 1983, 1984, and 1985) are liable under section 6661 for an addition to tax equal to 25 percent of the respective underpayments of tax. For a taxpayer to be liable for the substantial understatement addition to tax under section 6661, the amount of the understatement must exceed the greater of

10 percent of the tax required to be shown on the Federal income tax return or $5,000. Sec. 6661(b)(1)(A).

For purposes of section 6661, the amount of the understatement is reduced to the extent that the understatement is attributable to items with respect to which the taxpayer's tax treatment of the items is or was supported by substantial authority. Sec. 6661(b)(2)(B).

We have concluded that petitioners fraudulently failed to report substantial amounts of income on their respective Federal income tax returns. Petitioners did not have substantial authority for their failure to report as income those adjustments made by respondent which we have sustained. We sustain the adjustments made by respondent, and petitioners are liable for the section 6661 additions to tax as determined by respondent.

Decisions will be entered

under Rule 155.

Adjustments to Elvin's Returns

| Adjustment We Have Sustained | 1983 | Attrib. to Fraud | 1984 | Attrib. to Fraud | 1985 | Attrib. to Fraud | 1986 | Attrib. to Fraud |
|---|---|---|---|---|---|---|---|---|
| The YOC Elvin Account | $137,673 | No | $ 17,510 | No | $ 64,825 | No | $180,906 | No |
| Capriole | – | – | 170,635 | Yes | 133,179 | Yes | – | – |
| Sea Ray Boat | 1,155 | Yes | – | – | – | – | – | – |
| Motor Home | 10,697 | No | 16,802 | No | – | – | – | – |
| Sylva Residence | – | – | 15,000 | No | – | – | – | – |
| Travel/Entertainment | 22,014 | No | 14,012 | No | 22,080 | No | – | – |
| Employee Benefits Expense | 25,676 | Yes | 1,768 | Yes | – | – | – | – |
| Utilities Expense | 2,461 | Yes | 3,281 | Yes | – | – | – | – |
| Company Vehicle Expense | 1,663 | Yes | 2,179 | Yes | 4,084 | Yes | – | – |
| Miscellaneous Expense | 1,945 | Yes | 2,869 | Yes | 1,228 | Yes | – | – |
| Repair Expense | 9,693 | Yes | 312 | Yes | 2,227 | Yes | – | – |
| Outside Services Expense | 132 | Yes | 968 | Yes | 6,242 | Yes | – | – |
| Depreciation Expense | – | – | – | – | 2,400 | Yes | – | – |
| Salary Expense | 8,203 | Yes | 10,600 | Yes | 21,411 | Yes | – | – |
| Interest Expense | – | – | 2,053 | Yes | 10,947 | Yes | – | – |
| Demonstrator Vehicles Benefiting Elvin | 14,352 | No | 18,167 | No | 22,708 | No | – | – |
| Waterproofing Elvin's Personal Residence | – | – | – | – | – | – | 15,136 | Yes |
| Prizes and Awards | 4,361 | No | – | – | 10,087 | No | – | – |

Adjustments to YOC's Returns

| Adjustment We Have Sustained | 1983 | Attrib. to Fraud | 1984 | Attrib. to Fraud | 1985 | Attrib. to Fraud |
|---|---|---|---|---|---|---|
| Employee Benefits | $25,676 | Yes | $ 1,768 | Yes | $ – | – |
| Utilities Expense | 2,461 | Yes | 3,281 | Yes | – | – |
| Travel/Entertainment | 22,014 | No | 14,012 | No | 22,080 | No |
| Company Vehicle Expense | 1,663 | Yes | 2,179 | Yes | 4,084 | Yes |
| Miscellaneous Expense | 1,945 | Yes | 2,869 | Yes | 1,228 | Yes |
| Repair Expense | 9,693 | Yes | 312 | Yes | 2,227 | Yes |
| Insurance Expense | – | – | 383 | Yes | 4,200 | Yes |
| Outside Services Expense | 132 | Yes | 968 | Yes | 6,242 | Yes |
| Depreciation Expense | 1,363 | Yes | 915 | Yes | 1,751 | Yes |
| Salary Expense | 8,203 | Yes | 10,600 | Yes | 21,411 | Yes |
| Interest Expense | – | – | 2,053 | Yes | 10,947 | Yes |